NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0914n.06

No. 11-3328

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

***Aug 20, 2012***

LEONARD GREEN, Clerk

SIDI MOHAMED OULD AHMED,          )
                                             )

     Petitioner,                      )

                                           )   ON PETITION FOR REVIEW FROM
v.                                     )   AN ORDER OF THE BOARD
                                         )   OF IMMIGRATION APPEALS

ERIC H. HOLDER, JR., Attorney General   )

                                           )

     Respondent.                     )

**Before:**       **KEITH, MCKEAGUE, and DONALD, Circuit Judges.**

**PER CURIAM.**  Appellant Sidi Ould Ahmed ("Ahmed") petitions for review of the Board

of Immigration Appeal's ("the Board") decision denying his motion to reopen his immigration

proceedings.  He argues that the Board abused its discretion by denying his motion to reopen and by

considering the Immigration Judge's ("IJ") adverse credibility determination.  For the reasons

discussed below, we **DENY** the petition for review.

## BACKGROUND

Ahmed is a native and citizen of Mauritania who was admitted to the United States on

August 17, 2001, as a nonimmigrant student to attend the University of Louisville in Louisville,

Kentucky.  He did not attend the university, but instead filed an application for asylum, witholding

of removal, and protection under the United Nations Convention Against Torture and Other Forms

of Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").  An asylum officer denied

Ahmed's application, and a removal hearing was held in immigration court on May 27, 2004.  At

the hearing, Ahmed admitted the factual allegations in the Department of Homeland Security's

Notice to Appear; conceded removability; renewed his application for asylum, withholding of

removal, and protection under CAT; and requested the alternative relief of voluntary departure. He

then offered evidence concerning his political activities and encounters with police in Mauritania.

Pertinent to the petition now before us, Ahmed testified that he was a member of a political

party in Mauritania known as the United Forces of Democracy ("UFD")[1] and a second party known

as the Popular Front, the latter of which Ahmed claimed functioned in "a very secret way" for the

safety of its members. When shown documentary evidence from the Department of State that

Popular Front members recently won a legislative seat and eight Municipal Council seats in a

Mauritanian election, Ahmed responded that they must have run in secret, perhaps hiding the party's

"emblem or logo." The IJ found this explanation incredible: "[I]f they were not running as [Popular

Front] members, then they would be listed as independents winning the election, rather than as

[Popular Front] members winning the election. So obviously the State Department knows they are

[Popular Front], and presumably [so] does the Mauritania Government."

Ahmed further testified that, on December 16, 1998, police arrested him during a

demonstration. He stated that he was detained for four days, during which he was allegedly stripped

nearly naked, beaten with sticks, showered with cold water, and told to renounce his ideas. Ahmed

testified that he was also arrested on October 28, 2000, during another demonstration, and

experienced similar treatment. Following the second arrest, Ahmed stated that he was required to

---

[1]The Government refers to this party as the "Union of Democratic Forces."

report to the police on a daily basis for three or four months, and was periodically stopped or questioned but was never arrested. Ahmed claimed that he stopped reporting to the police after enduring a five-hour "talk" with them, which he alleges occurred on or about May 9, 2001.

He testified that, shortly after the five-hour "talk," his attorney at that time ("Chiebany") informed him that a criminal case had been brought against him. The IJ asked Ahmed about a letter allegedly from Chiebany, inquiring why the signature on the letter said "Abdalah El Dah." Ahmed claimed that Abdalah El Dah was one of Chiebany's interns. The IJ then asked Ahmed why the letter was dated December 2004, yet informed Ahmed of a trial that was *upcoming* on October, 28, 2000—nearly four years prior to the date on the letter. Ahmed responded that the letter was mistranslated, and claimed that (1) the October 28, 2000, date referred to his second arrest, not a trial, and (2) that the trial took place in 2005, not 2004. But the letter never mentioned anything occurring in 2005, and both Ahmed's interpreter and the court interpreter translated the letter as informing Ahmed of a trial set to take place on October 28, 2000.

Ahmed also submitted two letters from the Popular Front. The IJ noted that one of the letters, which was dated December 16, 1998, and stated that Ahmed was a party activist who had been arrested, served no purpose at the time it was allegedly written because Ahmed was not then applying for asylum and had no need for a letter describing his involvement with the party. The second letter also did "not seem to have any basis for existing," as it was addressed to Ahmed's family and contained information that was presumably already known to them, for example, his problems with the police. The IJ thus found the letters inconsequential at best and "doubtful and suspicious" at worst.

Ahmed also submitted the testimony of Khattry Ould Ahmedna ("Ahmedna"). The IJ rejected Ahmedna's testimony as "fairly suspect" because Ahmedna testified about details of abuse from Ahmed's second detention at which Ahmedna was not present, and because he was evasive. The IJ noted that "when testimony is weak or doubtful, corroboration is necessary," but Ahmed offered no such corroboration. *See Matter of Y-B-*, 21 I&N Dec. 1136 (BIA 1998).

In 2005, the IJ issued a decision denying Ahmed's application for asylum, withholding of removal, and CAT protection; granting his application for voluntary departure; and entering an alternative order of removal. The IJ observed that Ahmed's testimony was "evasive and nonresponsive," and that he "tended to go into long explanations where a yes or no would have been appropriate." He described the testimony as "not inherently believable" and at times "ludicrous," with "corroboration that is weak and suspect." The IJ described Ahmed's testimony regarding his 1998 arrest as "possibly" believable, but stated that "the rest of [Ahmed's] story the Court disbelieves entirely." Finally, the IJ noted that, even if the 1998 arrest and mistreatment actually occurred, "it is well established that minor beatings and brief detentions of a few days do not amount to persecution." *See Eusebio v. Ashcroft*, 361 F.3d 1088 (8th Cir. 2004); *see also Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004).[2]

Ahmed appealed to the Board, but the Board adopted and affirmed the IJ's decision based solely on the IJ's adverse credibility determination. It reiterated the IJ's determination that Ahmed "was not credible," "had not met his burden of proof," and that "inconsistencies" in the record

---

[2]The IJ also noted that the location at which the demonstration took place rendered it illegal, and "an arrest made at a demonstration that was lawless is not necessarily persecution at all."

constituted "a significant and adequate basis for an adverse credibility determination." Specifically, the Board addressed the "substantial contradiction" between Ahmed's testimony that the Popular Front was not a viable party and the evidence that the party won multiple seats in national and municipal elections. The Board also addressed the letter allegedly sent by Chiebany, noting the nonsensical dating. The Board rejected Ahmed's argument that Chiebany's letter was mistranslated, instead crediting the two translators. It concluded that the dubious authenticity of Chiebany's letter "undermine[d]" Ahmed's credibility in general. *See Matter of O-D-*, 21 I&N Dec. 1079, 1081-83 (BIA 1999) (submitting "counterfeit" and "probably counterfeit" evidence that goes to a "central element" of the claim "significantly undermines" the credibility of the petition and the petitioner.) Accordingly, the Board dismissed Ahmed's appeal.

Ahmed did not file a petition for review of the Board's dismissal. Rather, in April 2006, Ahmed filed a motion to reopen seeking adjustment of status based on a pending visa petition filed on his behalf by his wife, a United States citizen. The Board denied the motion because, having failed to depart the United States within 60 days of the Board's last decision, Ahmed violated the conditions of his grant of voluntary departure. Ahmed did not seek review of the denial.

More than four years later, in June 2010, Ahmed filed a second motion to reopen his removal proceedings. This time, Ahmed argued that reopening was appropriate because he had obtained new evidence that was previously unavailable: (i) a copy of an arrest warrant that was allegedly retrieved by a family friend ("Soulieman") working as a clerk at the Palace of Justice in Nouakchott, Mauritania, and an accompanying statement from Soulieman; (ii) a statement prepared by another family friend who was allegedly told by the Mauritanian police that they were searching for Ahmed

5

and would arrest him upon finding him; and (iii) a letter from Ahmed's father dated May 9, 2009, claiming that the police had twice "raided" the house looking for Ahmed. Ahmed also argued that country conditions in Mauritania had deteriorated, and submitted the 2010 country report on Mauritania prepared by Amnesty International ("2010 report"), the 2009 and 2005 Department of State Human Rights Report for Mauritania ("2009 report" and "2005 report," respectively) and a *New York Times* article from July 20, 2009, describing Mauritanian elections.[3]

On February 28, 2011, the Board denied Ahmed's second motion to reopen. It found that it was "both untimely and number-barred," and that Ahmed could not avail himself of the statutory exception to the time and number bars based on changed country conditions. Nor did the case merit *sua sponte* reopening because of the unreliable evidence Ahmed submitted with his second motion to reopen.[4] This petition for review followed.[5]

## DISCUSSION

Ahmed raises two arguments. First, he argues that the Board abused its discretion by denying his second motion to reopen. He asserts that, though the motion was both time- and number-barred,

---

[3]Department of State country reports are "generally the best source of information on conditions in foreign nations." *Sterkaj v. Gonzales*, 439 F.3d 273, 276 (6th Cir. 2006) (internal quotation and citation omitted).

[4]Ahmed does not challenge the Board's decision not to reopen his case *sua sponte*.

[5]Ahmed previously moved this court to stay his removal pending a decision on the merits of this appeal. We denied the motion on May 17, 2011, noting that the briefs had not been filed, but it was impossible to conclude that Ahmed had a likelihood of success on appeal given the Board's explanation supporting the denial of reopening.

he proffered evidence of changed country conditions sufficient to trigger the exception to the time and number rules. Second, Ahmed argues that the Board abused its discretion by relying on the IJ's adverse credibility determination when analyzing the applicability of the exception. We address these arguments in turn.

We review the denial of a motion to reopen immigration proceedings for an abuse of discretion. *Alizoti v. Gonzales*, 477 F.3d 448, 451 (6th Cir. 2007). An abuse of discretion occurs when the denial of the motion to reopen "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination." *Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir. 2005) (quotation and citation omitted).

## I. Changed country conditions

The Immigration and Nationality Act ("INA") imposes procedural limits on the filing of a motion to reopen immigration proceedings. First, an alien may file only one motion to reopen. *See* 8 U.S.C. § 1229a(c)(7)(A); *Tapia-Martinez v. Gonzales*, 482 F.3d 417, 421 (6th Cir. 2007). Second, an alien must file his motion to reopen within 90 days after the date on which the final administrative order of removal is entered. *See* 8 U.S.C. § 1229a(c)(7)(C); *Tapia-Martinez*, 482 F.3d at 421. These restrictions are excused where the motion is filed for the purpose of applying for asylum or withholding of removal "based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding." 8 U.S.C.

§ 1229a(c)(7)(C). "A party seeking reopening or reconsideration bears a 'heavy burden.'" *Alizoti*, 477 F.3d at 451 (citing *INS v. Doherty*, 502 U.S. 314, 323 (1992)). "Evidence of changes in personal circumstances, not accompanied by a change in country conditions, is not sufficient to support an untimely motion to reopen." *Niyibizi v. Mukasey*, 300 F. App'x 371, 374 (6th Cir. Nov. 6, 2008). Moreover, the evidence must show that the change in country conditions creates a real and individualized threat of harm to the applicant. *See Harchenko v. INS*, 379 F.3d 405, 410 (6th Cir. 2004) (an alien must provide "reasonably specific information showing a real threat of individual persecution").

It is undisputed that Ahmed filed more than one petition to reopen, and that he filed both his first and second petition more than 90 days after the statutory deadline. Thus, in order to transcend the INA's procedural bars, Ahmed must proffer material evidence of changed country conditions not available at the time of the prior proceeding, and must show that the new conditions place him under an individualized threat of persecution.

Ahmed argues that country conditions have changed because "successive coups in Mauritania have resulted in a significant increase of abuse and ill treatment of political prisoners." As proof, he points out that the 2005 report states, "[t]here were no reports of political prisoners," while the 2009 report states, "problems include mistreatment and torture of detainees . . . and political detention."

The Government counters (and the Board observed) that the reports actually show country conditions in Mauritania to be essentially static. In its most recent decision, the Board noted that "[t]he conditions that [Ahmed] alleges currently exist in Mauritania are substantially similar to those

that existed at the time of [his] 2005 hearing with regard to arbitrary arrests, detention, and police mistreatment." We agree.

The 2005 report, which Ahmed also submitted during the initial proceedings, describes Mauritanian authorities as corrupt and susceptible to bribery, and states that Mauritanian police arbitrarily detained people. It mentions "reports of political detainees," "credible reports" of prisoner abuse, and "harsh" prison conditions. It also states that there were no reports of "political prisoners," "politically motivated killings," or "politically motivated disappearances." (*Id.*) Finally, the 2005 report indicates that Mauritanian authorities generally respected freedom of speech, assembly, and association, but sometimes used force to restrict the exercise of these rights.

The 2009 report, which Ahmed submitted as part of his second motion to reopen, describes Mauritania almost identically: Mauritanian authorities were corrupt and susceptible to bribery, the police arbitrarily detained people, prison conditions were "harsh," and there were "credible reports" of prisoner abuse. Like the 2005 report, it states that there were no reports of "politically motivated killings" or "politically motivated disappearances," and that freedom of speech, assembly, and association remained generally, though not always, intact.

There are two differences between the 2005 report and the 2009 report that Ahmed relies upon to show changed country conditions. First, he cites the 2009 report's conclusion that, "[d]uring the year[,] there was a deterioration in the human rights situation," arguing that this shows a changed country condition. But the report does not state how much the situation deteriorated, or whether it

deteriorated relative to previous years.[6]  We cannot fault the Board for finding no change in country conditions based on such little information.

Second, the 2009 report describes an incident under the heading "Political *Prisoners and Detainees*":

> During the year [the Mauritanian National Bar Association] denounced the case of former prime minister Waghef[,] whom junta authorities had arrested and charged for embezzlement by a civil court in November 2008 following his initial arrest during the August 2008 coup.  On June 4, Waghef was released on bail as an opposition precondition for signing the Dakar Accord.

2009 Dep't of State Human Rights Report: Mauritania at 4-5 (emphasis added).  Ahmed appears to believe that this story demonstrates changed country conditions because, as his argument goes, the 2005 report said there were *no* reports of political prisoners and, we must assume, it is somehow clear that Prime Minister Waghef was a political prisoner despite the report's ambiguity.  Ahmed's argument presumes without explanation that he has accurately categorized the Prime Minister because, we must assume, his argument fails if the Prime Minister is *not* a political prisoner: *both* country reports acknowledge "reports of political detainees," and so there would be nothing new about the Prime Minister's captivity if he were, in fact, a political detainee.  But it is not clear that his argument fares any better if, as he asserts, Prime Minister Waghef was part of a "new" category, the political prisoner.  He has offered us no authority to support his arguments.  And we decline to parse the State Department's semantic choices based on speculations about how exactly it differentiates a "political detainee" from a "political prisoner," or to delineate a legally significant

---

[6]Nor is it clear that this would matter.  As discussed below, not every deterioration or unfavorable change constitutes changed country conditions.

distinction for ourselves. Even if we drew that line and concluded that the Prime Minister was, as Ahmed must argue, a political detainee, it would not necessarily help Ahmed. Case law suggests that even important events do not automatically create changed country conditions, even when dangerous, far-reaching, or the result of state action. *See, e.g., Wisageni v. Attorney General of the United States,* 385 F. App'x 73, 75 (3d Cir. 2010) (petition denied because newspaper accounts of bombings at two hotels in Indonesia did not demonstrate changed country conditions when Indonesia had experienced four major terrorist attacks in the 2000s, including three prior to petitioner's hearing before the IJ); *Zhang v. Mukasey*, 543 F.3d 851, 853 (6th Cir. 2008) (petition denied where petitioner argued that "the passage and enforcement of a new Chinese law" governing family planning constituted changed country conditions); *Liu v. Holder*, 560 F.3d 485, 487-88 (6th Cir. 2009) (no change in country conditions despite evidence that the Chinese government had passed new and restrictive laws).

Moreover, even if we assumed that the presence of a "political prisoner" constitutes a change in country conditions, we have no reason to conclude that Ahmed specifically is at risk of persecution. The "political prisoner" in question was a former prime minister, while Ahmed is, by all accounts, a private citizen who has been politically inactive for more than a decade, and whose political activity prior to leaving Mauritania included attending two demonstrations in two years. Ahmed asserts that the arrest warrant (allegedly procured by a family friend who worked at the Palace of Justice) is "material [evidence] because it directly relate[s] to the political situation in Mauritania," and demonstrates an individualized threat of persecution. However, for the reasons addressed above, Ahmed has not shown a change in country conditions, and so the question whether

11

such "change" is material to him, or whether such "change" in concert with new personal

circumstances warrants reopening, is immaterial. Even assuming otherwise, the arrest warrant does

not demonstrate that the purported changes in Mauritania create an individualized risk of

persecution. As the Board noted, the arrest warrant is suspect because of inconsistencies:

> While the respondent submits evidence he claims can corroborate his prior testimony, the "arrest warrant" he seeks to submit has no indicia of reliability and does not support reopening. The respondent previously testified he was arrested in 2000, and he presented other evidence—which was found not to be reliable—indicating there was an in absentia proceeding against him in 2000. Yet, the "arrest warrant" is dated 2001. This appears to conflict with his testimony . . . that he was questioned a couple of times in April or May 2001, but was not arrested at that time. Thus, the evidence not only fails to corroborate his prior testimony, but raises questions about its authenticity.

(internal citations omitted).

In light of the foregoing, we will not disturb the Board's conclusion that "[t]he conditions

that [Ahmed] alleges currently exist in Mauritania are substantially similar to those that existed at

the time of [his] 2005 hearing with regard to arbitrary arrests, detention, and police mistreatment."

And we agree that the evidence presented does not demonstrate a change in Mauritania that is

material to Ahmed's asylum claim or whether he is more likely than not to face torture.

## II. Reliance on the adverse credibility determination

The IJ determined that Ahmed's claim was not credible because of contradictions and

inconsistences regarding the Popular Front's status in Mauritania, Chiebany's oddly-dated letter, and

testimony it deemed "evasive," "nonresponsive," and "fairly suspect."[7] In affirming that decision, the Board stated, "We agree with the Immigration Judge's finding that the respondent's claim is not credible and base our decision solely on this finding." Subsequently, when denying Ahmed's second motion to reopen, the Board noted, "the [IJ] found that the respondent's claims were not credible, and we specifically affirmed this finding in our [first] decision dismissing the respondent's appeal." Ahmed argues that, in denying his second motion to reopen, the Board inappropriately relied on the IJ's adverse credibility determination and ignored the evidence he presented.

As an initial matter, we note that Ahmed never challenged the agency's adverse credibility determination and is now precluded from so doing. Federal law provides requirements for review of orders of removal. One such requirement is that "the petition for review must be filed not later than 30 days after the date of the final order of removal." 8 U.S.C. § 1252(b)(1). Nearly 6 years have passed since the agency's order of removal, along with the time for challenging the agency's October 28, 2005, final order. *See also Bowles v. Russell*, 551 U.S. 205, 214 (2007) (noting that there are no equitable exceptions to jurisdictional requirements). Moreover, we "lack[] jurisdiction to review any issues that have not been raised and administratively exhausted below." *Alizoti*, 477 F.3d at 451 (citing 8 U.S.C. § 1252(d)(1)). While Ahmed's appeal does not directly challenge the agency's adverse credibility determination, his motion to reopen is, essentially, a motion to

---

[7]The IJ observed that Ahmedna, who testified on Ahmed's behalf, "never even faced the camera at any time during his testimony, even after the Government attorney pointed it out to him. He was testifying in a slouching posture which is rarely seen in Immigration Court." What is more, Ahmedna testified about abuse Ahmed allegedly suffered "in his 1998 detention when, in fact, respondent's testimony was that [the abuse] occurred in his 2000 detention in which [Ahmedna] was not present."

reconsider his credibility: he relies on the same story now that he relied upon then, and that story was deemed incredible. To the extent he is attempting to challenge now what he did not challenge then, his motion is not well taken. But even giving Ahmed the benefit of the doubt and considering the merits of his claims, we conclude that the Board did not abuse its discretion.

The Board relied on *Zhang v. Mukasey* for the proposition that there is no abuse of discretion when it considers an "unrebutted adverse credibility determination in reviewing documentation submitted with a motion to reopen." In *Zhang*, the IJ made an adverse credibility determination at the petitioner's initial hearing. *Zhang*, 543 F.3d at 852. As part of her motion for reopening, the petitioner submitted "numerous documents," including a "letter from [her] best friend," which was "the only evidence of an individualized risk of persecution." *Id.* at 854-55. The Board first noted the IJ's conclusions that the petitioner was not credible, had submitted fraudulent documents, and her application was frivolous. *Id.* at 853-55. It then observed that she had provided the Board "no reason to doubt the IJ's conclusions." *Id.* In fact, some of the documents that the petitioner offered with her motion to reopen actually "cast doubt on her credibility." *Id.* at 855 n.3. To that extent, "the Board relied on the IJ's adverse credibly determination" when it declined to credit her letter. *Id.* at 853. On review, this Court concluded that the Board did not abuse its discretion "in declining to credit" weak evidence submitted with a motion to reopen—a decision the Board made after considering the IJ's adverse credibility finding and the petitioner's failure to rebut it. *Id.* at 855. Indeed, the decision was "rationally explained and within [the agency's] established policy." *Id.* at 855.

14

Ahmed's case is analogous. The IJ found him to be incredible based on "evasive and nonresponsive" testimony, corroborative evidence that was "suspect," the contradictions between Ahmed's description of the Popular Front and the fact that the party won seats in national and local elections, and documentary evidence that only highlighted inconsistencies in Ahmed's claims (such as the letter from Chiebany). The Board affirmed that decision. Ahmed never challenged the agency's credibility determination, and the evidence proffered with his second motion to reopen does not rehabilitate his credibility. To the contrary, it calls his credibility once again into question. Ahmed argues that *Zhang* is "easily distinguishable" because, in that case, the agency found that the petitioner had submitted fraudulent documents. We are unpersuaded by Ahmed's attempts to differentiate his case from *Zhang*. To be sure, the agency in *Zhang* specifically stated that the documents were "fraudulent." *Zhang*, 543 F.3d at 852. But the inconsistences in the *Zhang* documents closely mirror the inconsistencies in Ahmed's documents. For example, the petitioner submitted a letter documenting an alleged forced abortion that was purportedly signed in China by her family members, but records showed that those family members had been in the United States "for years prior to the incident." *Id.* Here, the letters and documentary evidence contained dates and signatures inconsistent with Ahmed's testimony or, given the testimony and chronology of alleged events, had no "basis for existing." This makes them "doubtful and suspicious" and supports the adverse credibility finding.

In any event, the documentary problems in *Zhang* (on which Ahmed relies to distinguish that case) were not the "most damning factor" in the adverse credibility determination. *Zhang*, 543 F.3d at 852. Rather, the agency was most concerned with "the evolution of Zhang's story from her initial

statements to immigration officials to the story she pressed in the hearing." *Id.* In other words, the fraudulent documents were part of a larger pattern of inconsistencies. As described above, Ahmed's case is marked with inconsistencies, and the agency documented those inconsistencies in each of its decisions.

Thus, we cannot say that the Board's consideration of the adverse credibility finding occurred "without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination." *Allabani*, 402 F.3d at 675. The agency provided a rational explanation for its finding regarding Ahmed's credibility, and how that finding affected the motion to reopen. *Zhang* illustrates that the Board did not depart from established policies by considering the IJ's adverse credibility determination when evaluating the evidence Ahmed submitted with his second motion to reopen. *Zhang*, 543 F.3d at 855. Ahmed does not allege and the record does not indicate that invidious discrimination or any other impermissible consideration played a role in the adjudication. We therefore reject Ahmed's arguments as grounds for granting a petition for review.

## CONCLUSION

For the foregoing reasons, we **DENY** the petition for review.