NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0323n.06

No. 19-3859

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ISMAILA BA, | ) | |
| **Petitioner,** | ) | ON PETITION FOR REVIEW |
| | ) | OF AN ORDER OF THE |
| v. | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| WILLIAM P. BARR, Attorney General, | ) | |
| **Respondent.** | ) | **OPINION** |
| | ) | |

Before:  SILER, MOORE, and NALBANDIAN, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**  Ismaila Ba petitions for review of the

decision of the Board of Immigration Appeals ("BIA") denying his motion to reopen his removal

proceedings.  Because the BIA erred in concluding that Ba's motion was foreclosed by his failure

to demonstrate in his removal proceedings that he is Mauritanian and that he was enslaved, we

**GRANT** the petition for review, **VACATE** the BIA's order, and **REMAND** for proceedings

consistent with this opinion.

## I.  BACKGROUND

Ba is a native and citizen of Mauritania.  Administrative Record ("A.R.") at 824 (Notice to

Appear).  He entered the United States at or near Miami, Florida on or about July 11, 1998, and

was not admitted or paroled after inspection by an Immigration Officer.  *Id.*  On January 15, 1999,

Ba submitted an application for asylum and other relief from removal, claiming that he had been

enslaved as a Black Mauritanian by an Arab master and feared returning to Mauritania because he could be killed by his former master. *Id.* at 806, 808, 810 (First Asylum Appl. at 4, 6, 8). On October 1, 1999, the Department of Homeland Security ("DHS") issued a Notice to Appear in removal proceedings to Ba, charging him as removable under 8 U.S.C. § 1182(a)(6)(A)(i). *Id.* at 824 (Notice to Appear). Ba submitted an updated application for relief in April 2000. *Id.* at 787 (Second Asylum Appl. at 8). On May 4, 2000, Ba admitted the allegations in DHS's Notice to Appear and conceded the charge. *Id.* at 692–97 (Initial Hr'g Tr. at 1–6).

## A. Ba's Removal Proceedings

On October 23, 2000, Ba testified in support of his applications for relief to the following information.[1] He was born into slavery and his entire family was in the service of a master. A.R. at 705 (Asylum Hr'g Tr. at 13). His family lived in "the regional city of Kaédi," *id.* at 726, in a separate house owned by the master, *id.* at 706. At the hearing, Ba identified his master by name and described him as a "shepherd" who also owned a boutique. *Id.* at 705–06. Ba would lead his master's animals to the pasture, and afterwards he would wait on clients in the boutique, *id.* at 706, in which he would sell and serve tea, *id.* at 722. The master provided "nothing" in compensation for Ba's labor, and Ba was permitted to eat only after the master had finished eating. *Id.* at 707. Ba attended religious school from 1968 to 1970, *id.* at 723, and high school from 1970 to 1976, until his master wanted him to stop, *id.* at 724. Ba's sister eventually left the family by way of marriage to the slave of another family, which Ba's master arranged. *Id.* at 707.

---

[1]Ba testified in French through an official interpreter. A.R. at 698 (Asylum Hr'g Tr.) (Cover Page).

Ba's father died in 1990, which marked the beginning of Ba's sexual abuse by his master. *Id.* at 727. Ba stated that his master "performed sodomy on [him]." *Id.* at 708. The abuse happened "frequently," "[s]ometimes . . . twice a week." *Id.* at 728. Ba never told his mother about the abuse, both because "[t]here was nothing [his] mother could have done about it," and because "[i]t was shameful." *Id.* at 728. After his mother's death in 1992, *id.* at 707, "the abuse began to intensify." *Id.* at 708. When asked why he did not struggle against the sexual abuse, Ba responded: "Resistance would have meant nothing. It wouldn't have served any purpose. I had no rights. It was within his." *Id.* at 714.

Ba decided to flee. *Id.* at 716. Although he did not receive compensation for his labor from his master, he gradually saved up small amounts of money that he was given by suitors of his master's daughters when they would come to court the daughters. *Id.* at 716–17. "[L]ittle by little," Ba benefitted from this keep-the-change routine: A young man would come to the house to court the master's daughter and to serve her tea; the man would give Ba money to go next door and purchase water, sugar, spoons, and other "accoutrements"; and when Ba would return to give the man the leftover money, the man would not take it, in order to "make a good impression in front of the woman." *Id.* at 716–17. Ba put this money in a satchel, dug a hole, and hid it there. *Id.* at 717.

In March 1998, he left the house when it was empty, took a taxi to the train station, and then took a car to the city of Nouakchott. *Id.* at 717–18. After arriving the next day, he took a car

3

with other passengers to Nouadhibou[2], arriving the following day. *Id.* at 718. Ba used the money he had saved up to pay for these transportation expenses. *Id.* at 729–30. He decided to go to Nouadhibou because it was "very far away," "[s]omewhere where one of [the master's] relatives or a friend of his could not recognize [him]." *Id.* at 719. If he had been recognized, the master "would have had the right . . . either to . . . kill [him] or to . . . commit even worse atrocities than he had." *Id.* In Nouadhibou, Ba walked to Cansado,[3] where he eventually secured a job on a fishing boat and spent five months working without pay. *Id.* at 719–20. He "felt liberated" on this boat. *Id.* at 744. At the advice of the boat's captain, Ba thereafter boarded another boat on May 5, 1998 that took him to the United States, and because the prior boat's captain had "arranged the affair," Ba did not have to pay for the transatlantic journey. *Id.* at 719–20. Ba did not remain in Nouadhibou because he "wanted to go very, very, very, very far from [his] master[,] [s]o when [he] had the occasion to get on a . . . fishing boat, [he] took it." *Id.* at 731–32; *id.* at 744 ("Mauritania is large. But the population is not very big. And we can recognize one another very easily. I could have been recognized by a member of my master's family, a friend of my master.").

With respect to identity documents, Ba was not able to secure a Mauritanian passport. *Id.* at 720. When asked why he had submitted a nationality certificate with his asylum application that indicated that he resided in Nouakchott, despite testifying that he resided in Kaédi for his

---

[2]The name of his town is spelled incorrectly in the asylum hearing transcript. *See, e.g.*, A.R. at 730 (Asylum Hr'g Tr. at 38) ("Nouadhibon"); Oxford Concise Dictionary of World Place Names (John Everett-Heath ed., 3d ed.) ("Nouadhibou").

[3]The name of his town is spelled incorrectly in the asylum hearing transcript. *See* A.R. at 719 (Asylum Hr'g Tr. at 27) ("Kasando"); Oxford Concise Dictionary of World Place Names (John Everett-Heath ed., 3d ed.) ("Cansado").

4

entire life, he responded that he "received that document [from] [his] father when he was on his death bed" and "c[ouldn]'t say why it says that [he] lived in Nawacha." *Id.* at 726–27.[4] The IJ noted that she "d[id]n't see any document saying that [he] w[as] a slave." *Id.* at 751. Ba stated that he did not know "why the word slave isn't indicated on [his] identity card." *Id.*

Ba testified that he did not know that under current Mauritanian law, adults could not be forced to remain with former masters. *Id.* at 738. "[W]hat I do know," he stated, "is that there are still adults who are slaves." *Id.* He testified that he possessed non-notarized documents from Mauritanian friends in Columbus, Ohio indicating that individuals are forced to return to their masters in Mauritania. *Id.* at 738–39.

The IJ then questioned Ba about his language abilities and his nationality. Ba testified that his "best language"—and the national language of Mauritania—was French. *Id.* at 739–40. The IJ countered that the submitted Country Reports indicated that Arabic was the national language of Mauritania. *Id.* at 740. Ba explained that French was "our first language." *Id.* The IJ asked, "[W]hy [are you] speaking in French when you were the slave of an Arabic -- of an Arab -- of an Arab-speaking Arab?" *Id.* Ba replied that at his master's home they spoke Hassaniya, an Arabic dialect, but once his master took him out of school, Ba "decided that [he] wanted to keep as much as [he] could from what [he] had been learning in French," so he spoke French as often as possible. *Id.* The IJ then asked, "What's the national language of Senegal?" to which Ba responded, "I think it must be French." *Id.* at 740–41. The IJ replied, "It is French. Are you from Senegal?" and Ba

_____

[4]"Nawacha" appears to be a phonetic spelling of the word "Nouakchott." *Compare* A.R. at 727 (Asylum Hr'g Tr. at 35) (referring to "nationality certificate" that states that Ba lived in "Nawacha"), *with id.* at 791 (Second Asylum Appl., Translated Nationality Certificate) (issued by "Nouakchott Court of the First Instance").

stated that he was "not Senegalese." *Id.* at 741. The IJ stated that, "[t]he Court finds that it is highly unusual that you would have been enslaved from infancy in an Arabic family and be speaking French here today in Court." *Id.* Ba explained that "after having seen and felt the atrocities that were committed against my family and myself, I decided to make French my -- a language." *Id.* The following colloquy ensued:

> [IJ]: Well, we have an Arab interpreter this afternoon. If -- would you be able to speak to that Arab interpreter?
>
> [Ba]: But that would be going backwards. I, I couldn't do it.
>
> [IJ]: You wouldn't be able to speak in Arabic to an Arabic interpreter? You wouldn't be able to hold a conversation in Arabic, would you?
>
> [Ba]: I'm not saying that I'm incapable. But the Hassaniya that we speak is a derivative of Arabic. So there, there are words that I could understand. But in general, we couldn't communicate.
>
> [IJ]: Well, what about if this may be a Hassaniya interpreter. Will you be able to carry on a conversation this afternoon?
>
> [Interpreter]: A little bit. But he's asking that the Judge not force him to return to memories that he would, he would rather not reinvoke.

*Id.* at 741–42. The IJ later stated that she "believe[d] [that Ba] is Senegalese, quite frankly. Based on his language here today. French. Education." *Id.* at 751.

The IJ then noted that Ba had fled to Nouakchott and Nouadhibou, "where 60% are Senegalese." *Id.* at 743. She further stated that "[i]t doesn't sound like [Ba] w[as] a disadvantaged class" because Ba was "high school educated" and "was able to save up enough money to pay [his] way to the United States." *Id.* at 745. The IJ remarked, "[O]ne principle of slavery is don't educate them, I would think. This whole thing is implausible." *Id.* at 748. She also remarked that it would be "really unusual" for Ba to have been enslaved in a city, when the Country Reports stated that

6

slavery "still exists in rare cases in the countryside," *id.* at 749, and that he was "quite a different kind of slave" given his level of education, *id.* at 750.

**B. IJ's Decision**

The IJ denied Ba's application for relief in an oral decision. *Id.* at 671 (IJ Decision at 1). The IJ found that Ba "ha[d] not presented a credible claim for relief" for several reasons. *Id.* at 675; *id.* ("Court finds respondent not credible because based on the elicited acts cited below, such claim is implausible."). First, Ba spoke French—not Hassaniya Arabic—as his preferred language, and could "only speak a little" of the latter. *Id.* at 675–76. It was "therefore . . . totally implausible that . . . he and his family have been slaves to Arabs." *Id.* at 676. The IJ found Ba's explanation for speaking French to be "totally incredible." *Id.* Second, Ba was "relatively educated," based on educational statistics in Mauritania, leading to the IJ to "discount[] [Ba]'s claim for asylum based on being a slave." *Id.* There was also an "inconsistency" in Ba's testimony about his menial labor duties versus his master's decision to send him to school. *Id.* at 677. Third, Ba's keep-the-change anecdote was "implausible with the whole concept of being a slave and providing free labor." *Id.* Fourth, Ba was "unable to explain why he could not have adopted safe haven in Nouadhibon and Nouakchott . . . since he testified that he was unharmed there and he felt liberated." *Id.* Fifth, the combination of Ba's "unreliable identity records" (which did not indicate that he was a slave), "his fluent French" (the national language of Senegal), and the Country Reports statistic that 60% of Mauritanian small boat fishermen were Senegalese (when Ba had acknowledged that other individuals on his fishing boat were Senegalese) "strongly suggest[ed] to the Court that [Ba] is, in fact, Senegalese." *Id.* Sixth, his certificate of nationality stated that he resided in Nouakchott, but his testimony was "that he had always lived in Kaédi." *Id.* at 677–78.

Seventh, it was unlikely that Ba was a slave because Kaédi was not in the countryside, which is where "one would reasonably expect a slave to be." *Id.* at 678. Eighth, slavery had been outlawed in Mauritania since 1980, and contrary to Ba's testimony, adults could not be forced to remain with their masters or to return if they left. *Id.* Alternatively, the IJ noted that even if Ba were credible, "changed conditions in his country show that he has no reasonable fear of being recovered by his master." *Id.* at 678–79.

Having denied Ba's application for relief, the IJ ordered Ba removed to Mauritania. *Id.* at 679 (IJ Order). Ba timely filed a notice of appeal. *Id.* at 662 (Notice of Appeal).

## C. Appeal and Present Motion to Reopen

The Board of Immigration Appeals ("BIA") summarily affirmed the IJ's decision without opinion. *Id.* at 366 (BIA Summary Order). Ba thereafter filed multiple motions to reopen, based on an approved I-130 visa petition, which were denied and are not relevant to this case. *See id.* at 281–82 (First Mot. to Reopen); *id.* at 276 (First BIA Order Denying Mot. to Reopen); *id.* at 255 (Mot. to Reconsider and Second Mot. to Reopen); *id.* at 250–51 (Second BIA Order Denying Mot. to Reopen).

On October 22, 2018, Ba filed the motion to reopen that is at issue in this case. A.R. at 33 (Third Mot. to Reopen at 10). In it, he explained that since the time he had been ordered removed, "[d]ue to the unavailability of travel documents from Mauritania; the fact that his country has stripped him of his citizenship; DHS's priority scheme for deportations; and the unsafe conditions in Mauritania, [he] was allowed to remain in the U.S. for almost two decades." *Id.* at 26. Ba stated that "he complied with DHS's requests for regular check-ins with ICE, and continued to live his life in the United States," including raising two children who are United States citizens. *Id.* The

No. 19-3859, *Ba v. Barr*

motion asserts that Ba's removal proceedings should be reopened because conditions in Mauritania have worsened, "particularly for a Christian of Afro-Mauritanian descent like [him]," and that Mauritania's "recent actions to jail political opponents" and to subject activists to detention and torture threaten his safety. *Id.* at 28. Ba appended to his motion a proposed application for relief, in which he stated, *inter alia*, that "the government would detain and torture me for my political beliefs in opposition to slavery," and that "you will be put to death if you denounce the religion of Islam: I am Christian." *Id.* at 241 (Proposed Asylum Appl. at 5).

The BIA denied Ba's motion, A.R. at 3 (Third BIA Order Denying Mot. to Reopen) (hereinafter "BIA Decision"), providing the following reasoning for its denial:

> The respondent avers that conditions in Mauritania have harshened for Christians of "Afro-Mauritanian descent" like himself, rendering him likely to return to the "slave caste" in that country (Motion at 6-10). However, the respondent has not addressed the adverse credibility findings of the Immigration Judge, which this Board summarily affirmed (IJ at 5).[] In rendering this finding, the Immigration Judge found the respondent's claim that he had been a slave in Mauritania was implausible, citing various reasons (IJ at 5-9). The Immigration Judge also cited the fact that French was the respondent's preferred language, and the lack of reliable identity documents, in finding that the respondent is actually Senegalese, rather than a native and citizen of Mauritania, as he claims (IJ at 7-8).[5]
>
> Therefore, the respondent has not shown that his proffered evidence, relating to conditions in Mauritania, reflects any materially changed country conditions showing that he is now eligible for relief from removal. The respondent also has not demonstrated any material change in Senegal. Accordingly, the respondent's motion is not exempt from the above-noted statutory bars on motions to reopen, and reopening is not warranted.

---

[5]Here, footnote 3 of the BIA's decision reads: "The respondent has not submitted any evidence with his motion showing that he is a national and/or citizen of Mauritania. Absent such basic, yet significant, evidence, he has not demonstrated the materiality of any of the evidence relating to conditions in Mauritania." *Id.* at 4 n.3.

*Id.* at 3–4 (citation omitted). Ba timely petitioned this court for review. We have jurisdiction to review the BIA's decision pursuant to 8 U.S.C. § 1252(a)(1).

## II.  STANDARD OF REVIEW

"This Court reviews the BIA's denial of a motion to reopen for abuse of discretion." *Alizoti v. Gonzales*, 477 F.3d 448, 451 (6th Cir. 2007). "The BIA abuses its discretion when it acts arbitrarily, irrationally, or contrary to law." *Id.*; *Balani v. I.N.S.*, 669 F.2d 1157, 1161 (6th Cir. 1982) ("In determining whether the Board abused its discretion, this Court must decide whether the denial of Petitioner's motion to reopen deportation proceedings was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group."). "The Supreme Court has made clear that reopening is discretionary with the BIA and that the BIA retains broad discretion to grant or deny such motions." *Alizoti*, 477 F.3d at 451.

## III.  DISCUSSION

### A.  Limited Scope of Review

Before assessing whether Ba's petition has merit, we must clarify the limited scope of our review, which requires some background on the statutory framework for motions to reopen. Generally, "a party may file only one motion to reopen [removal] proceedings (whether before the Board or the Immigration Judge) and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened." 8 C.F.R. § 1003.2(c)(2). But when an applicant applies or reapplies for asylum "based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or

10

presented at the previous hearing," these time and numerical limitations do not apply. 8 C.F.R. § 1003.2(c)(3)(ii). The question here is whether these limitations apply.

In concluding that these limitations *did* apply to—and thus precluded—Ba's motion to reopen, the BIA reasoned that he had failed to "address[] the adverse credibility findings of the Immigration Judge," specifically with respect to his claims that he was Mauritanian and that he was a slave. A.R. at 3–4 (BIA Decision at 1–2). Because "the Board's denial of relief may be affirmed only on the basis articulated in the decision and this Court may not assume that the Board considered factors that it failed to mention in its opinion," *Daneshvar v. Ashcroft*, 355 F.3d 615, 626 (6th Cir. 2004), we review only what the BIA actually said in its order. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; [we] require[] that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself."). The "basis articulated in the [BIA] decision," in this case, was Ba's failure to submit evidence "showing that he is a national and/or citizen of Mauritania," A.R. at 4 (BIA Decision at 2 n.3), or otherwise rebutting the credibility finding of the IJ with respect to his prior asylum claims, *id.* at 1–2. Accordingly, we do not address whether Ba has made a prima facie showing of eligibility for relief, as is required in motions to reopen, because the BIA did not address this requirement. *Alizoti*, 477 F.3d at 451–52 (citing 8 C.F.R. § 1003.2(c)). Nor do we assess whether the voluminous evidence that Ba appended to his motion to reopen does, in fact, demonstrate a relevant change in country conditions and whether it was "not available and could not have been discovered or presented at the previous hearing," 8 C.F.R. § 1003.2(c)(3)(ii), because the BIA has not yet had the opportunity to engage in this analysis.

**B. Ba's Nationality and Past Enslavement**

The BIA concluded that Ba's motion was not exempt from the statutory bars on motions to reopen because (1) he did not address the IJ's findings that he was neither Mauritanian nor a slave, and "therefore" (2) he had failed to show that his now-proffered evidence about Mauritania "reflects any materially changed country conditions showing that he is now eligible for relief from removal." A.R. at 4 (BIA Decision at 2). We address the first link in this syllogism. Assuming that the IJ did, in fact, find that Ba was Senegalese and not Mauritanian, and that he was not a slave,[6] it is unclear how Ba's failure to rebut these findings would foreclose his present motion to reopen, which is based on changed circumstances that have to do with his religion and political beliefs, not his nationality or past enslavement. The BIA's decision denying Ba's motion to reopen faulted him for failing to "demonstrate[] the materiality of any of the evidence relating to conditions in Mauritania," *id.* (BIA Decision at 2 n.3), but did not acknowledge that regardless of his nationality, the country to which Ba—who is allegedly a Christian and an opponent of

---

[6]Ba makes the additional argument in Part IV of his brief that "the IJ did not 'find' [that] Mr. Ba was from Senegal." Pet. Br. at 22. The government does not directly contest this assertion, but responds that "the record makes clear that the agency did not believe Ba credibly showed that he is Mauritanian." Resp. Br. at 17. It is true that in order to discredit testimony, the BIA or IJ "must make the determination that a declaration is 'inherently unbelievable,'" and neither entity did so explicitly here. *Trujillo Diaz v. Sessions*, 880 F.3d 244, 253 (6th Cir. 2018) (quoting *Haftlang v. INS*, 790 F.2d 140, 144 n.2 (D.C. Cir. 1986)); *see* A.R. at 751 (Asylum Hr'g Tr. at 59) ("I believe respondent is Senegalese, quite frankly. Based on his language here today. French. Education."); *id.* at 49 (A.R. at 741) ("The Court finds that it is highly unusual that you would have been enslaved from infancy in an Arabic family and be speaking French here today in Court."); IJ Decision at 7 (A.R. at 677) (finding that statistic about percentage of Mauritanian small-boat fisherman who were Senegalese, Ba's "unreliable identity records," and his French fluency "strongly suggest to the Court that he is, in fact, Senegalese"). *But see* IJ Decision at 6 (A.R. at 686) ("Respondent's explanation for speaking French . . . is totally incredible."). But because we resolve Ba's petition on other grounds, we do not address this argument.

slavery—will be removed is Mauritania, *see* A.R. at 664 (IJ Order) ("Respondent's application for voluntary departure was denied and respondent was ordered removed to Mauritania."), which apparently persecutes Christians and opponents of slavery, *see id.* at 68–235 (evidence of changed country conditions). Although Ba specifies that he is a "Christian of Afro-Mauritanian descent," nowhere in his motion to reopen or in his proposed asylum application does he allege that he will be targeted on the basis of his nationality. A.R. at 28 (Third Mot. to Reopen at 5). Put simply, the IJ's suspicions that Ba was not Mauritanian and had not been enslaved need not be revisited on a motion to reopen in order to assess whether he will be persecuted if removed to Mauritania. Contrary logic would have doomed many of history's most desperate asylum applicants. For example, a Jewish asylum applicant fleeing Nazi persecution in the 1930s who both (a) claimed German nationality and (b) failed to convince the Board that he was German would have been removed to Germany, even if it was undisputed that he was Jewish and that the Nazi regime persecuted members of the Jewish faith. Such a result—focusing on disbelieved nationality when nationality itself was irrelevant—would have been "without a rational explanation." *Balani*, 669 F.2d at 1161. For Ba, it is his religion and political beliefs, not his nationality—be it Senegalese or Mauritanian—or his past enslavement that allegedly expose him to persecution.

The irrelevance of Ba's alleged nationality and past enslavement to his present motion is even clearer when considering why these things *were* relevant to his past asylum application. For Ba's 2000 asylum claim, he was obligated to present a coherent, credible claim of past persecution. The fact that he spoke better French than Arabic "suggest[ed] to the Court that he is, in fact, Senegalese," IJ Decision at 7, which in turn meant that his claim of past persecution in Mauritania was not credible. *See id.* at 8 (discussing the "plausibility of his being an educated French-speaking

13

slave to an Arab master in Kaédi"). In other words, if Ba was lying about being Mauritanian, it was less likely that his claim about being enslaved in Mauritania was true. The same is not true for his present claim. Whereas Ba's application for relief in 2000 hinged on the plausibility of his backward-looking claim that he *had been* enslaved in Mauritania, Ba's present asylum claim hinges on the plausibility of the forward-looking possibility that he *will be* persecuted in Mauritania.[7] Only for the former claim was Ba's credibility in describing his Mauritanian roots relevant.

This is unlike, for example, the scenario we addressed in *Ahmed v. Holder*, 495 F. App'x 605 (6th Cir. 2012). In *Ahmed*, the petitioner first failed to testify credibly that he had been targeted for political persecution in Mauritania. *Id.* at 606–07. Several years later, he filed a motion to reopen his removal proceedings based on new evidence supporting his initial claim of political persecution. *Id.* at 608. When the BIA denied his motion to reopen, it relied on the prior adverse credibility determination. *Id.* at 612. We found no error in this reliance, explaining: "While Ahmed's appeal does not directly challenge the agency's adverse credibility determination, his motion to reopen is, essentially, a motion to reconsider his credibility: *he relies on the same story*

---

[7]A change in personal circumstances alone, such as a conversion to Christianity, does not constitute changed country conditions for purposes of 8 C.F.R. § 1003.2(c)(3)(ii). *See Haddad v. Gonzales*, 437 F.3d 515, 517 (6th Cir. 2006); *see also* 8 U.S.C. § 1229a(c)(7)(C)(ii). But if the petitioner can demonstrate that a change in country conditions would lead to his persecution based on a corresponding change in his own personal circumstances, this is permissible. *See Chandra v. Holder*, 751 F.3d 1034, 1039 (9th Cir. 2014). "Personal conversion to a group does not foreclose the possibility that a country can 'for its own reasons, become[ ] more hostile towards an alien or his group' at the same time." *Yu Yun Zhang v. Holder*, 702 F.3d 878, 880 (6th Cir. 2012) (alteration in original) (quoting *Tan Wu Zhang v. Holder*, 385 F. App'x 546, 547 (6th Cir. 2010)). For reasons discussed above, *supra* Part III.A, we leave it to the BIA to determine whether Ba has demonstrated either a change in country conditions or a corresponding change in his personal circumstances.

*now that he relied upon then*, and that story was deemed incredible." *Id.* (emphasis added); *see also Yan Xia Zhang v. Mukasey*, 543 F.3d 851, 855 (6th Cir. 2008) (BIA did not abuse its discretion in declining to credit new evidence of China's population-policy persecution when the petitioner made "no attempt . . . to rehabilitate her credibility" after testifying incredibly, in the initial asylum proceeding, about her persecution under this policy). Here, by contrast, Ba does not rely on the same story, or even the same bases of persecution.[8]

Alternatively, the government appears to argue that the BIA more generally "rejected Ba's credibility." Resp. Br. at 20. It is unclear whether the government means to suggest that apart from the substance of his incredible testimony in the prior asylum hearing, Ba has been found to lack credibility in general. Regardless, in this case, the BIA did not deny Ba's motion to reopen on the basis that he generally lacked credibility; the BIA's decision does not regard his motion to reopen or proposed asylum application as inherently unbelievable because of some history of fraudulent conduct. *Cf. Gafurova v. Sessions*, 712 F. App'x 540, 546 (6th Cir. 2017) (upholding the IJ's and BIA's consideration of the petitioner's prior adverse credibility findings, when "under the circumstances," she "had a history of providing false statements under oath and of submitting fraudulent documents"); *Yan Xia Zhang*, 543 F.3d at 852 (IJ deemed "fraudulent" a "written document meant to confirm the forced abortion episode [that] was signed by her father and brother even though the official Chinese household identity card Zhang provided to the court indicated both men had been living in the United States for years prior to the incident").

---

[8]There is yet another aspect of illogic to the BIA's consideration of Ba's nationality: It results in the conclusion that Ba should be removed to Mauritania because he has not demonstrated that he is Mauritanian. *See* IJ Order (A.R. at 664).

The BIA here did not conclude that, for example, Ba had an established lack of credibility, and that therefore his claim that he converted to Christianity was unbelievable. On this issue, compare Ba's case to *Gafurova*, in which the asylum applicant's motion to reopen based on changed circumstances was denied because "[t]he only evidence that the Respondent attached to her new I-589 to support her contention that she is now Christian is her own affidavit," and "*[d]ue to her history of fabricating information*, the Court will give no weight to the Respondent's affidavit as she has no credibility." *Gafurova* A.R. at 46 (IJ Decision at 3) (emphasis added); *see also id.* at 4–5 (*Gafurova* BIA Decision at 2–3) ("The respondent also asserts that the Immigration Judge inappropriately prejudged her credibility. However, the Immigration Judge was fairly considering *the respondent's lack of credibility as it has been a continuous issue [in] her proceedings*, and the initial adverse credibility finding by the Immigration Judge has been upheld by this Board and the federal court of appeals.") (emphasis added). In *Gafurova*, we affirmed the IJ and BIA's decisions, because they relied on the petitioner's general lack of credibility. 712 F. App'x at 546. Here, the BIA did not conclude that Ba's motion to reopen must fail because he generally lacks credibility. Rather, as discussed above, it held that his failure to rebut the prior adverse credibility determination was dispositive because it established that he was not Mauritanian and was not a slave. Absent any indication in the BIA's decision that it regarded Ba as generally untrustworthy or fraudulent, its reliance on the past, claim-specific credibility determination was "without a rational explanation." *Balani*, 669 F.2d at 1161.

\*\*\*

As discussed above, *supra* Part III.A, we will not proceed to analyze whether Ba has adequately demonstrated a material change in country conditions that he could not have presented

at his initial asylum hearing or, even further, a prima facie case for relief. *See Daneshvar*, 355 F.3d at 626; *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16–17, (2002) ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands. This principle has obvious importance in the immigration context. . . . The agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides."). "[I]t is for the BIA to address th[is] matter[] in the first instance." *Torres-Vaquerano v. Holder*, 529 F. App'x 444, 449 (6th Cir. 2013).

## IV. CONCLUSION

For the foregoing reasons, we **GRANT** the petition for review, **VACATE** the BIA's decision, and **REMAND** for further proceedings consistent with this opinion.